=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 108
In the Matter of Greater Jamaica
Development Corporation, et al.,
            Respondents,
        v.
New York City Tax Commission,
et al.,
            Appellants.



        Vincent D'Orazio, for appellants.
        Ronald G. Blum, for respondents.
        New York State Conference of Mayors and Municipal
Officers; Lawyers Alliance for New York et al., amici curiae.



PIGOTT, J.:

        Petitioner Jamaica First Parking, LLC (Jamaica First)

owns and operates five commercial parking facilities for the

purpose of furthering the goal of its sole member -- not-for-

profit corporation Greater Jamaica Development Corporation

- 1 -

(Greater Jamaica) -- revitalize downtown Jamaica, Queens.  The

issue on this appeal is whether respondent New York City Tax

Commission improperly revoked Jamaica First's real property tax

exemption pursuant to Real Property Tax Law (RPTL) § 420-a (1)

(a).  We hold that because Jamaica First's ownership and

operation of the parking facilities is not incidental to a tax-

exempt purpose, it is not entitled to a real property tax

exemption under that statute.

I.

Greater Jamaica was formed in 1967 to promote commerce

and business growth in downtown Jamaica.  It is exempt from

federal income taxation pursuant to Internal Revenue Code (26

USC) § 501 (c) (3),[1] and, as Greater Jamaica's certificate of

incorporation states, it is "organized and . . . operated

exclusively for charitable, scientific and educational purposes

within the meaning of [that section]."  Such purposes include,

among other things, the promotion and coordination of Jamaica's

business, commercial and retail districts; the encouragement of

development of Jamaica's commercial, industrial and manufacturing

facilities; and the provision of support and assistance in the

planning, development and expansion of Jamaica's cultural,

-----

[1]  As relevant here, the following organizations are exempt
from federal income taxation under this provision: "Corporations,
any community chest fund, or foundation, organized and operated
exclusively for religious, charitable, scientific, testing for
public safety, literary or educational purposes . . ." (emphasis
supplied).

recreational, governmental and transportation facilities in Jamaica.

Consistent with those purposes, in 1996, Greater Jamaica purchased a parking garage from the City of New York through New York City's Economic Development Corporation (EDC). Two years later, Greater Jamaica formed Jamaica First, a Delaware limited liability company, with Greater Jamaica constituting Jamaica First's sole member. Jamaica First's amended and restated limited liability company agreement states that Jamaica First was "formed for the purpose of acquiring, owning, developing and operating public parking facilities on a nonprofit basis, including financing the acquisition and development of three public parking facilities in Jamaica, New York, in furtherance of the charitable purposes of the Member." Jamaica First's certificate of formation provides that it "shall carry on any lawful purpose or activity not inconsistent with" Greater Jamaica's tax exempt status under Internal Revenue Code (26 USC) § 501 (c) (3).

In 2001, Jamaica First purchased three parking facilities from the City of New York through the EDC; said facilities had previously been operated by the New York City Department of Transportation. Greater Jamaica expended monies to renovate and upgrade the facilities. That same year, the Internal Revenue Service (IRS) issued Greater Jamaica a private letter ruling explaining that the separate legal existence of

Jamaica First would be disregarded for federal income tax purposes, such that the acquisition, financing, renovation, operation and use of the parking facilities by Jamaica First would be treated for federal income tax purposes as the acquisition, financing, renovation, operation and use of the parking facilities by Greater Jamaica.  Moreover, according to the letter ruling, Jamaica First's operation of the parking facilities would be substantially related to Greater Jamaica's charitable exempt purposes under Internal Revenue Code (26 USC) § 501 (c) (3) and would lessen the burdens of government within the meaning of 26 CFR 1.501 (c)(3)-1(d)(2).

In 2004, Greater Jamaica conveyed the parking garage it purchased in 1996 to Jamaica First.  Jamaica First thereafter purchased vacant land from the City and finished construction of a 410-car parking garage on that property in 2006.  According to Greater Jamaica and Jamaica First, all five parking facilities provide below-market, reasonably-priced parking for local retail stores, state and federal office buildings and religious organizations.

In 2007, respondent New York City Department of Finance (DOF) granted real property tax exemptions for the five parking facilities pursuant to RPTL 420-a (1) (a).  Four years later, the DOF revoked the exemptions, stating that the properties' uses as parking facilities did not fall into any of the enumerated uses of section 420-a and asserting that the status that the IRS

bestowed upon Greater Jamaica was "not determinative of the issue of charitable use of the property as defined by 420-a."  The DOF determined that the use of the parking facilities, even for economic development of an underdeveloped area, did not constitute a "charitable" use, and that the parking facilities were "not incidental to another recognized charitable purpose but [were] the very purpose for which the property [was] being used." According to the DOF, although the parking facilities served an important public purpose like community development, that purpose by itself did not qualify the properties for a charitable exemption under section 420-a.

## II.

Greater Jamaica and Jamaica First (collectively, "petitioners") commenced this hybrid proceeding pursuant to RPTL article 7 and CPLR article 78 against the DOF and the New York City Tax Commission (collectively, "City") requesting a judgment declaring that the City's decision to revoke the exemptions was arbitrary and capricious and contrary to law and that Jamaica First was entitled to the exemptions.  Petitioners also sought a judgment directing the City to grant the tax exemptions.[2]  The City cross-moved for an order dismissing that part of the petition seeking relief pursuant to CPLR article 78, relying on its 2011 revocation letter along with the statements in the

---

[2] Petitioners further sought a judgment pursuant to article 7 of the RPTL challenging the amount of the assessments, but that challenge is not at issue on this appeal.

amended verified petition and Jamaica First's amended limited liability agreement that Jamaica First was "formed for the purpose of acquiring, owning, developing and operating public parking facilities on a nonprofit basis" as part of Greater Jamaica's charitable purpose of promoting commerce and business growth in Jamaica.  The City argued that the parking facilities were not entitled to a section 420-a exemption because they were neither owned nor operated exclusively for a charitable purpose. Supreme Court upheld the City's revocation of the tax exemption and granted its cross motion to dismiss the petition.

The Appellate Division reversed the order and judgment insofar as appealed from by petitioners, granted the parking facilities the tax exemption, annulled the City's determination and denied the City's cross motion (111 AD3d 937, 937 [2d Dept 2013]).  It held that the City failed to meet its burden of establishing "revocation of the tax exemption on the grounds that petitioners' activity did not conform to a charitable purpose within the meaning of RPTL 420-a" (id. at 939).  The court explained that

> "[a]bsent a precise statutory definition of
> 'charitable purpose,' courts have interpreted
> this category to include relief of poverty,
> advancement of governmental and municipal
> purposes, and other objectives that are
> beneficial to the community.  Furthermore, a
> property owner seeking a real property tax
> exemption which demonstrates that it is a
> not-for-profit entity whose tax-exempt status
> has been recognized by the [IRS] and whose
> property is used solely for charitable
> purposes has made a presumptive showing of

entitlement to exemption" (id. [internal quotation marks, brackets and citations omitted]).

The Appellate Division pointed to petitioners' submission of the IRS's letter ruling recognizing them as charitable organizations, and also to Greater Jamaica's certificate of incorporation -- which stated that Greater Jamaica was to be operated for charitable purposes -- as proof that it was operated for a charitable purpose (see id.). As to Jamaica First, the court observed that Jamaica First's certificate of formation explained that it was created to carry out Greater Jamaica's "charitable purposes by acquiring and operating public parking facilities on a nonprofit basis," such that both organizations had established that they were formed for a charitable purpose pursuant to RPTL 420-a (id. at 939-940). Finally, according to the Appellate Division, "petitioners demonstrated that the use of their public parking facilities was consistent with their exempt purpose, as expressly noted by the IRS in granting such operation tax exempt status," because their "charitable purpose was to improve Jamaica's business district through further economic development offering convenient and inexpensive public parking to attract visitors and businesses was central to their aim" (id. at 940).

We granted the City leave to appeal and now reverse.

### III.

RPTL 420-a (1) (a) provides that real property owned by

a corporation or association that is "organized or conducted exclusively for . . . charitable purposes," if used "exclusively" for such purposes, will be exempt from taxation (RPTL 420-a [1] [a]).  We have held that "[t]he term 'exclusively', in this context, has been broadly defined to connote 'principal' or 'primary' such that purposes and uses merely 'auxiliary or incidental to the main and exempt purpose and use will not defeat the exemption'" (Matter of Yeshivath Shearith Hapletah v Assessor of Town of Fallsburg, 79 NY2d 244, 249 [1992], quoting Matter of Association of Bar of City of N.Y. v Lewisohn, 34 NY2d 143, 153 [1974]).  Thus, whether property is used "exclusively" for purposes of section 420-a is dependent upon whether the "primary use" of the property is in furtherance of permitted purposes (Matter of Yeshivath Shearith Hapletah, 79 NY2d at 250).

Here, the City revoked the parking facilities' section 420-a tax exemption after having previously allowed the exemption in 2007.  Although the burden of proof generally lies with the party seeking the exemption, in a situation like this, where the taxing authority seeks to revoke that exemption previously granted, it is the taxing authority that has the burden of establishing that the property is not exempt from taxation (see Matter of Lackawanna Community Dev. Corp. v Krakowski, 12 NY3d 578, 581 [2009], citing Matter of New York Botanical Garden v Assessors of Town of Washington, 55 NY2d 328, 334 [1982]).  In order to meet that burden, the City was required to demonstrate

either that petitioners were "not organized or conducted primarily for" an exempt purposes or that the parking facilities were "not used exclusively for carrying out thereupon one or more" exempt purposes (RPTL 420-a [1] [a]; see Congregation Rabbinical College of Tartikov, Inc. v Town of Ramapo, 17 NY3d 763, 764 [2011] [holding that municipality failed to establish that the primary use of the property was not in furtherance of a tax-exempt purpose]).

The City revoked the tax exemption on the ground that it was erroneously awarded in the first instance. It met its burden in this regard by demonstrating that the "use" of the parking facilities was not for "charitable" purposes but rather for economic development, and that the use of the parking facilities were not "incidental to another recognized charitable purpose." Specifically, the City's revocation letter explained that the City reached its determination after reviewing documents submitted to it by Greater Jamaica and case law from this Court. The City also explained why it believed that the status granted Greater Jamaica by the IRS had no bearing on the issue of "charitable use" of the parking facilities under section 420-a. The letter stated that although the parking facilities may have served "an important public purpose and support[ed] development of a community," those factors did not qualify the facilities for a charitable exemption. Indeed, according to the City's review of the ownership structure of the lots along with other

documentation, it appeared that Jamaica First collected monies that exceeded the carrying, maintenance and depreciation charges attributable to the premises and that Jamaica First utilized those excess proceeds to fund other additional operations, such as the purchase of an additional parking lot.

The City submitted additional proof in the form of an affirmation by the City's Assistant Corporation Counsel, which pointed out that the factual allegations in the petition established that the facilities were not entitled to the exemption because Jamaica First was established for the sole purposes of acquiring, owning, developing and operating public parking facilities to promote Greater Jamaica's primary purpose of promoting commerce and business growth in Jamaica.  Thus, the grounds in the City's revocation letter, which were plainly sufficient on their own but nonetheless elucidated by the affirmation of the City's Assistant Corporation Counsel detailing how the allegations in the petition established that the parking facilities were not being operated for a charitable purpose, were sufficient to meet the City's initial burden of establishing that petitioners were not entitled to the tax exemption, i.e., that the use of the property was not in furtherance of a tax-exempt purpose, thereby shifting the burden to petitioners to establish their entitlement to an exemption.  We hold that petitioners did not meet their burden in that regard.

IV.

Although our inquiry as to whether petitioners established that the parking facilities are entitled to a tax exemption would ordinarily begin with an analysis of whether petitioners were "organized or conducted exclusively for" a tax-exempt purpose (RPTL 420-a [1] [a]), we assume for purposes of this appeal that they were.[3]  However, we must nonetheless clarify that the Appellate Division erred to the extent that it held that petitioners made a presumptive showing of their entitlement to a real property tax exemption under section 420-a by establishing that their tax-exempt status as a "charitable organization" had been recognized by the IRS (111 AD3d at 939, citing Matter of Plattsburgh Airbase Redevelopment Corp. v Rosenbaum, 101 AD3d 21, 23 [3d Dept 2012], quoting Yeshiva Beth Yahuda V'Chaim D'Betlan v Town of Shandaken, 100 AD2d 641, 642 [3d Dept 1984]).  Yeshiva Beth involved an attempt by a school district to vacate a default judgment against it that had been obtained by a religious corporation (100 AD2d at 642).  The court held that the school district was unable to refute the religious

_____

[3]  Indeed, there is evidence in the record that both petitioners met this standard.  Affixed to the petition are Greater Jamaica's certificate of incorporation which provides that it is a not-for-profit entity that was operated for, among other things, charitable purposes, and Jamaica First's certificate of formation, which states that it was created to assist in the charitable purposes of its member, Greater Jamaica. Greater Jamaica's president submitted an affidavit detailing certain of the works engaged in by Greater Jamaica that could arguably be considered "charitable."

corporation's "presumptive showing" of entitlement to an exemption through its averment that it was a religious corporation whose tax-exempt status had been recognized by the IRS and that the property was used for a religious purpose (id.).

In Yeshiva Beth, not only was the procedural posture different from the one presented here, it also involved a religious organization. Such organizations are recognized by both Internal Revenue Code (26 USC) § 501 (c) (3) and RPTL 420-a (1) (a). Indeed, a closer look at both provisions indicates that there is some overlap between the two in the criteria that the relevant taxing authorities will consider in determining whether a corporation is either exempt from federal income taxation under Internal Revenue Code (26 USC) § 501 (c) (3) or entitled to an exemption under RPTL 420-a (1) (a) (see IRC § 501 [c] [3] [organizations that are "organized and operated exclusively for religious, charitable, scientific . . . or educational purposes" entitled to federal income tax exemption]; RPTL 420-a [1] [a] [real property entitled to tax exemption if "owned by a corporation or association organized or conducted exclusively for religious [or] charitable . . . purposes"]). However, there are significant distinctions between the two provisions that prohibit the application of the type of presumption that the Appellate Division utilized in this case.

First, as already noted, Internal Revenue Code (26 USC) § 501 (c) (3) exempts certain organizations from federal income

<u>taxation</u>.  Section 420-a exempts certain organizations from <u>real</u>
<u>property taxation</u>.  Our local governments derive significant
revenue from the imposition of real property taxes, and federal
income taxation standards cannot be utilized to create a
presumption in favor of property owner seeking an exemption from
a state real property tax.

Second, Internal Revenue Code (26 USC) § 501 (c) (3)
and section 420-a utilize different tests in determining whether
a given organization is entitled to a tax exemption under the
relevant statute.  Internal Revenue Code (26 USC) § 501 (c) (3)
utilizes a two-pronged "organizational" and "operational" test,
meaning that the organization must be "organized exclusively for
one or more exempt purposes" delineated in that section (26 CFR
1.501 [c] [3]-1 [b] [1] [i]) <u>and</u> it must be "operated exclusively
for one or more exempt purposes" (26 CFR 1.501 [c] [3]-1 [c]
[1]).  This requires an analysis of the organization and its
operation as a whole.  In contrast, section 420-a considers
whether the real property is <u>owned</u> by a corporation or
organization that is "organized and conducted exclusively" for
one of the exempt purposes and whether the property is "<u>used</u>
<u>exclusively</u> for carrying out thereupon one or more of such
purposes" (emphasis supplied), meaning that the critical analysis
for real property tax exemption purposes requires an analysis of
the ownership and use of the property by the organization seeking
the exemption.

And, finally, the Internal Revenue Code contains a broad definition of what constitutes a "charitable" purpose. Specifically, the term "charitable" as used by Internal Revenue Code (26 USC) § 501 (c) (3) is defined as

> "[r]elief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (1) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency" (26 CFR 1.501 [c] [3]-1 [d] [2]).

In contrast, section 420-a does not contain a definition of what constitutes a "charitable" purpose, although, if the Legislature intended for such an expansive definition of charitable purpose to apply, it could have easily referenced the Internal Revenue Code's definition in section 420-a or adopted it outright.

That being said, although an entity's section 501 (c) (3) status does not entitle it to a presumption that it is "organized or conducted exclusively for" a tax exempt purpose under RPTL 420-a (1) (a), that does not mean that courts considering an owner's entitlement to an exemption under that statute are prohibited from considering the entity's section 501 (c) (3) status as part of its overall analysis. Rather, we hold that evidence of an organization's section 501 (c) (3) status, by itself, does not create a presumption that the entity is entitled

to a tax exemption under section 420-a.  This is evident from our prior holdings, where we have specifically stated that, for purposes of determining a real property tax exemption, a "favorable determination from the United States Department of the Treasury as to [an entity's] exempt status for other tax purposes" is not dispositive (see Matter of Swedenborg Found. v Lewisohn, 40 NY2d 87, 95 [1976] [holding that nonprofit corporation that distributed writings of theologian that were sold at or below cost or distributed at no cost was not entitled to real property tax exemption because its purpose was neither primarily religious nor charitable]; Matter of Association of Bar of City of N.Y., 34 NY2d at 154 [finding unpersuasive decisions acknowledging the "charitable" character of bar associations]). Therefore, to the extent lower court cases have held that such a presumption exists (see e.g. Oorah, Inc. v Town of Jefferson, 119 AD3d 1179, 1181 [3d Dept 2014]; Matter of Plattsburgh Airbase Redevelopment Corp., 101 AD3d at 23), they should no longer be followed for that proposition.

Although we do not disturb the Appellate Division's holding that petitioners met the "organized or conducted exclusively for . . . charitable . . . purposes" prong of the tax exemption test, we part company with the Appellate Division relative to its holding that "petitioners demonstrated that the use of their public parking facilities was consistent with their exempt purpose, as expressly noted by the IRS in granting such

operation tax exempt status" (111 AD3d at 940 [emphasis supplied]). By so holding, the Appellate Division utilized the petitioners' organizational status' under Internal Revenue Code (26 USC) § 501 (c) (3) to support its holding that petitioners' demonstrated that the use of the parking facilities was for an exempt purpose. This was error.

As explained above, the IRS's definition of what constitutes an exempt "charitable" purpose is exceedingly broad, including, among other things, "the lessening of the burdens of [g]overnment" (26 CFR 1.501 [c] [3]-1 [d] [2]), while the second prong of section 420-a (1) (a) requires a court to review "the actual or physical use of the property when it exempts from taxation property 'used exclusively for carrying out thereupon one or more' exempt purposes" (Matter of Lackawanna Community Dev. Corp., 12 NY3d at 581, quoting RPTL 420-a [1] [a]). Thus, our analysis under section 420-a is concerned with the "use" of the parking facilities as a whole, and whether the facilities are "used exclusively for carrying out thereupon one or more of [section 420-a's] purposes."

Petitioners argue that the facilities provide "below-market, reasonably priced parking" for residents, workers and visitors to downtown Jamaica's retail stores and government offices. They claim that the revocation of tax-exempt status will result in the loss of business and visitors to malls and shopping areas with more affordable (or free) parking. While

Greater Jamaica's overall goal to create and maintain a viable downtown Jamaica is commendable, as are the means in facilitating that goal, i.e., through the operation of parking facilities that enable visitors to frequent local businesses, that does not mean that the facilitation of parking for such purposes constitutes a charitable use of the property under section 420-a (1) (a).

We disagree with petitioners' assertion that the parking facilities are charitable in and of themselves because they fulfill the primary purpose of economic development. The economic benefit conveyed by below-market rate parking, however, inures to the benefit of private enterprise and cannot be said to further any charitable purpose. It lessens the burden of local businesses, obviating any need for them to make their own parking arrangements for prospective customers. The below-market rates that the facilities charge provide an incentive for the public to patronize those businesses, providing a dual benefit for local business and a benefit to prospective customers of those businesses. While these goals may be laudable, they are not charitable.

The petitioners further claim that the parking facilities lessen the burden on local government, which, incidentally, is deemed a "charitable" purpose under the Internal Revenue Code (see 26 CFR 1-501 [c] [3]-1 [d] [2]). They claim that the creation of the parking facilities relieved Jamaica of the burden of operating public parking lots. Essentially,

petitioners' argument is that the parking facilities provide a public benefit. But, as we have held on more than one occasion, "public benefit is not the test of qualification for exemption" (Matter of Association of Bar of City of N.Y., 34 NY2d at 154-155; see Matter of Swedenborg Found., 40 NY2d at 95).

To be sure, we have observed that "[f]or property to be entitled to an exemption on the ground that it is being used for a charitable purpose, it must a fortiori be used for a public purpose," explaining, for example, that "one may not establish a trust solely for the benefit of oneself and one's family, and then obtain a tax exemption for property owned by such a trust by claiming that it is a charitable organization" (Matter of North Manursing Wildlife Sanctuary, 48 NY2d 135, 140 [1979]). We explained in Matter of North Manursing that exemptions are provided for those charitable uses that benefit the public and "not for so-called 'charities' which benefit only their creators" (id.). Our utilization of the term "public purpose" and indirect reference to "public benefit" acknowledges that while consideration of the benefit bestowed upon the public is but one factor that the courts may consider in determining whether the property is "used exclusively" for one of the enumerated tax exempt purposes, it is the "used exclusively" test, and not the alleged "public benefit" test, that is the relevant inquiry. The parking facilities may very well provide a "public benefit," but the overall use to which these facilities are put, i.e., to

further economic development and lessen the burdens of government, cannot be deemed "charitable" within the meaning of section 420-a (1) (a).

Nor can it be said that the operation of the parking facilities is "incidental" to a charitable purpose in the vein of similar uses that we, and other courts, have upheld as tax exempt (see Matter of Merry-Go-Round Playhouse, Inc. v Assessor of City of Auburn, 24 NY3d 362, 368 [2014] [use of apartment buildings to provide housing for summer stock actors was incidental to theater organization's primary purpose of encouraging art appreciation through theater]; Matter of Adult Home at Erie Station, Inc. v Assessor of City of Middletown, 10 NY3d 205, 216 [2008] [use of residences by participants in a community re-entry program was incidental to the property owner's "charitable purpose" of combating homelessness and drug abuse among low-income people]; Matter of St. Luke's Hosp. v Boyland, 12 NY2d 135, 143 [1962] [partial tax exemption granted to portions of 10 apartment buildings owned by hospital because the apartments, which were occupied by its staff and their families, was "reasonably incident" to the hospital's primary purpose]; see also Matter of Vassar Bros. Hosp. v City of Poughkeepsie, 97 AD3d 756, 759 [2d Dept 2012] [parking garage parcel only partially exempt where a substantial portion of said garage was "allocated for a use not reasonably incidental to the purpose of the hospital," i.e., a medical office adjacent to the garage]; Matter of St. Francis

Hosp. v Taber, 76 AD3d 635, 640 [2d Dept 2010] [partial exemption
granted for parking garage adjacent to nonprofit hospital that
was utilized by hospital's visitors, patients and staff, since
such use was "necessarily incidental" to the hospital's exempt
purpose]; Matter of Ellis Hosp. v Assessor of City of
Schenectady, 288 AD2d 581, 583 [3d Dept 2001]).

In Vassar Bros., St. Francis Hosp. and Ellis Hosp., the
courts held that the nonprofit hospitals' parking spaces that
were set aside for employees and patients of private medical
clinics were not entitled to a tax exemption because such uses
were not "incidental" to the nonprofit hospitals' primary
purposes.  The same can be said for the uses of parking
facilities in this instance.  They are commercial lots that exist
to promote economic development in downtown Jamaica, providing
easy access to local retail stores and government buildings.
While there may be a tenuous connection between the monies raised
from the parking facilities and other charitable purposes engaged
in by Greater Jamaica -- indeed, petitioners acknowledge that
Jamaica Parking "has contributed excess revenues to assist
[Greater Jamaica] in meeting its operating expenses" -- the uses
of these facilities are not incidental to Greater Jamaica's
charitable purposes.

Petitioners acknowledge that any monies in excess of
the operating costs of the parking lots are utilized by Greater
Jamaica in furtherance of charitable uses.  But that does not

detract from the fact that the parking lots' primary use is to generate profits for distribution to Greater Jamaica[4] (see e.g. Matter of Stuyvesant Sq. Thrift Shop v Tax Commn. of City of N.Y., 76 AD2d 461, 464-465 [1st Dept 1980], affd for reasons stated below 54 NY2d 735, 737 [1981] ["The fact that the net cash profits are ultimately distributed to various institutions organized for charitable purposes does not in and of itself directly involve the (thrift store) in the charitable activities of the distributee organization within the meaning of" the real property tax law exemption statute]; cf. Matter of Salvation Army v Town of Ellicott Bd. of Assessment Review, 100 AD2d 361, 364-365 [4th Dept 1984] [thrift store provided "meaningful work and areas of endeavor" to persons seeking to "become self-supporting assets to society" and the profit-making aspect of the store was "only a small part of the purpose of the Salvation Army thrift stores"]). Inasmuch as the parking facilities themselves are not incidental to a charitable purpose, they are not entitled to a section 420-a (1) (a) tax exemption.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to that court

---

[4] Our determination in this regard is premised not on the fact that the parking facilities themselves may be profitable, but is instead premised on how the parking facilities are utilized (see Matter of Adult Home, 10 NY3d at 216). And, as we have noted in other instances, "[a] 'commercial patina' alone is not enough to defeat tax-exempt status . . ." (Matter of Symphony Space v Tishelman, 60 NY2d 33, 38-39 [1983]; see Matter of Merry Go-Round Playhouse, Inc., 24 NY3d at 367).

for consideration of issues that were raised but not determined on the appeal to that court.

Matter of Greater Jamaica Development Corporation v New York City Tax Commission

No. 108

READ, J. (DISSENTING):

Petitioner Greater Jamaica Development Corporation (Greater Jamaica), formed in 1967 under New York's former Membership Corporation Law, is organized and operated exclusively for charitable, scientific and educational purposes within the meaning of section 501 (c) (3) of the United States Internal Revenue Code with a broad remit to improve economic and living conditions in Jamaica, Queens,[1] an aging urban area that had

_____

[1]Greater Jamaica's Certificate of Incorporation delineates seven specific charitable corporate purposes: (1) to promote, assist, participate in and coordinate sound planning and improve development of Jamaica's business-commercial-retail district; (2) to encourage and effect the development and expansion of commercial, industrial and manufacturing facilities in Jamaica; (3) to support and assist in the planning, development and expansion of educational, cultural, recreational, residential, governmental, transportation and other related facilities in Jamaica; (4) to carry on research and other studies in order to develop an overall comprehensive plan and subsidiary plans as may be necessary or appropriate for Jamaica's sound growth and improved development; (5) to provide assistance of every kind, including the rendering of advice, technical services and financial aid in connection with securing private or government aid to individuals, associations, corporations and other organizations, whether organized for profit or otherwise, interested in or working toward the sound growth and improved development of Jamaica or any part thereof, and to provide such assistance in connection with the formation of such organizations; (6) to assist and cooperate with federal, state and local departments, agencies and government organizations of

- 1 -

fallen on especially hard times.  From the outset of Greater
Jamaica's efforts on behalf of the Jamaica community, it was
apparent that the shortage of downtown parking hampered economic
revitalization.  Accordingly, in 1976 Greater Jamaica applied to
the United States Economic Development Administration on behalf
of the City of New York (the City) for a grant to construct a new
municipal garage.  The application was approved, resulting in a
$3.4 million grant to the City, which completed construction of a
530-car garage in 1978.  The New York City Department of
Transportation initially operated this public parking facility.

Over time the garage sunk into a state of disrepair
and, consequently, disuse.  In 1996, Greater Jamaica purchased it
from the City through the New York City Economic Development
Corporation (EDC).  Two years later, Greater Jamaica formed
Jamaica First Parking, LLC (Jamaica First) as a special-purpose
nonprofit entity with the sole purpose of owning and operating
parking facilities exclusively "in furtherance of the charitable
purpose of the member [i.e., Greater Jamaica])."  In 2001,
Jamaica First purchased three additional run-down parking
facilities from the City.  Then in 2004, Jamaica First bought
vacant land from the City and constructed a 410-car public
parking garage with a $5 million grant from the City through the

---

every kind in furtherance of Greater Jamaica's purposes to the
end that Jamaica shall receive the maximum possible benefit from
federal, state and local programs; and (7) to assist and
cooperate with other organizations in furtherance of the
aforesaid purposes.

EDC.[2]  Greater Jamaica matched the grant with $6 million in debt from the proceeds of tax-exempt facility revenue bonds issued by the New York City Industrial Development Agency.  This garage was completed in 2006.  Greater Jamaica alleges that these "parking facilities, operated efficiently and at below-market rates, are integral to [its] mission of creating and maintaining a viable downtown Jamaica."

In 2007, the New York City Department of Finance (DOF or the agency) granted Greater Jamaica a full exemption from real property taxes for the five parking facilities (three garages and two lots) (see Real Property Tax Law § 420-a [1] [a], discussed infra).  DOF continued to grant the exemption for ensuing tax years until 2011.  Then, although the tentative assessment roll for the 2011-2012 tax year, dated January 5, 2011, still listed the full exemption as applicable, DOF suddenly executed an about-

_____

[2]Hereafter, "Greater Jamaica" refers collectively to Greater Jamaica and Jamaica First, unless the context specifically indicates otherwise.  As a single-member limited liability company, Jamaica First is generally treated as a branch or division of its owner, Greater Jamaica, for federal income tax purposes rather than as a separate entity (see 26 CFR 301.7701-3).  Similarly, the City disregards single-member limited liability companies as separate entities for purposes of section 420-a (1) (a) so long as certain requirements are fulfilled (see e.g. DOF Letter Ruling No. 074873-021, 2007 NY City Tax LEXIS 17 [Nov 21, 2007]).  DOF's General Counsel raised a question about whether Greater Jamaica and/or Jamaica First met certain of these requirements when she informed Greater Jamaica that its real property tax exemption was going to be revoked.  Although repeatedly referring to the five properties as "a stand-alone, for-profit, commercial parking garage" or a "free-standing commercial parking lot," the City does not suggest on this appeal that Greater Jamaica and Jamaica First are separate entities.

face.  In a letter dated February 23, 2011, DOF, by its General Counsel, notified Greater Jamaica of its intention to revoke the exemption, beginning with the 2011-2012 tax year.  By notice dated February 24, DOF formalized the revocation.

Greater Jamaica, and amici curiae the Lawyers' Alliance for New York, the Queens Chamber of Commerce and the Nonprofit Coordinating Committee of New York, Inc., assert that the decision to revoke Greater Jamaica's real property tax exemption was transparently "political," pointing to an opinion column in a New York City tabloid, with a dateline of December 3, 2010 (http://www.nydailynews.com/new-york/queens-garage-company-unusual-tax-exemption-2-000-space-parking-system-article-1,469,283).  The column's author lambasted the City for "dol[ing] out charitable tax exemptions to parking garages" while reportedly "tak[ing them] away from churches"; intimated that the exemption was granted only because of Greater Jamaica's allegedly close ties to "several major Queens political figures"; and stated that DOF's spokesman had assured the author that "officials are taking another look at the arrangement" by "reviewing this issue to determine whether these properties are eligible for a tax exemption."  Whatever prompted DOF's review and subsequent revocation of Greater Jamaica's section 420-a (1) (a) exemption, the agency has not justified its determination that as of 2011 the five parcels no longer qualified.

Relevant Law

Pursuant to Real Property Tax Law § 420-a (1) (a), real property is mandatorily exempt from taxation if it satisfies two criteria.  First, the property must be owned by a nonprofit corporation or association organized or conducted exclusively for one or more specified purposes (religious, charitable, hospital, educational or moral or mental improvement of men, women or children); second, the property must be used exclusively for carrying out one or more of the enumerated purposes.[3]  With respect to both the first ("purpose") and the second ("use") criterion, we have interpreted the term "exclusively" to mean "principally" or "primarily" rather than "only" or "solely" (see e.g. Matter of Association of Bar of City of N.Y. v Lewisohn, 34 NY2d 143, 153 [1974]).

We have cautioned that tax authorities and the courts should not interpret the general categories of "charitable, educational and moral and mental improvement" in section 420-a (1) (a) in a way that is "overly narrow" or "so literal and narrow that it defeats the exemption's settled purpose," even though, in the first instance, "exemption statutes [are to] be

---

[3]Section 420-a (1) (a) reads as follows:

"Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, or moral or mental improvement of men, women or children purposes, . . . and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association . . . shall be exempt from taxation."

construed strictly against the taxpayer seeking the benefit of the exemption" (Matter of Symphony Space v Tishelman, 60 NY2d 33, 36 [1983]).  In Symphony Space itself, we held that a nonprofit's theater for the performing arts qualified for an exemption pursuant to section 420-a (1) despite a "'commercial patina'" created by rentals and the charging of admission fees for performances (id. at 38).  And over the years, New York's courts have considered a wide range of endeavors to fall within the broadly stated categories of purposes specified in section 420-a (1) (a) (see e.g. Mohonk Trust v Board of Assessors of Town of Gardiner, 47 NY2d 476 [1979] [an organization whose primary purpose "is the preservation of wilderness areas" constitutes a "charitable, educational, or mental or moral improvement" purpose under the statute]; Matter of North Manursing Wildlife Sanctuary (City of Rye), 48 NY2d 135 [1979] [land used "as a wildlife sanctuary for birds and small animals" is a charitable use under the statute]; Adult Home at Erie Station, Inc. v Assessor (10 NY3d 205, 214 [2008] [Erie Station] [housing provided to the elderly at below market rates "is plainly [used for] a charitable purpose"]; Matter of Salvation Army v Town of Ellicott Bd. of Assessment Review (100 AD2d 361 [4th Dept 1984] [characterizing "work therapy" and "rehabilitation opportunities" as a charitable purpose]; Farm Sanctuary Inc. v Patton (221 AD2d 67, 69 [3d Dept 1996] [organization which has "the primary purpose . . . [of] the care and maintenance of abandoned and abused farm animals"

qualifies as a charitable purpose]); Plattsburgh Airbase Redevelopment Corp. v Rosenbaum (101 AD3d 21, 24 [3d Dept 2012] [an organization whose "very purpose is to own, maintain, market and sell [] land to promote economic development" is engaged in and using the land for a charitable purpose]).

The determination of whether real property is used exclusively for an exempt purpose turns on whether its primary use is in furtherance of the organization's exempt purpose. Property used for purposes that are "reasonably incident" to the organization's primary purpose qualifies for exemption, a standard the courts have also broadly construed (People ex rel. Watchtower Bible & Tract Socy. v Haring (8 NY2d 350, 358 [1960]; see e.g. St. Joseph's Health Ctr. Props, inc. v Srogi, 51 NY2d 127 [1980] [property used as a residential facility for hospital staff]; Rudolf Steiner Educ. & Farming Assn. v Brennan, 65 AD2d 868 [3d Dept 1978], appeal denied, 46 NY2d 709 [1979] [a farm operated by an educational institution]; Univ. Auxiliary Servs. v Smith, 78 AD2d 959 [3d Dept 1980], affd, 54 NY2d 986 [1981] [improved land used to provide services (food services, a book store and recreation) to a college community and vacant land owned by the educational institution]).

Finally, where a municipality seeks "'to withdraw a previously granted tax exemption,'" we have held that "'the municipality bears the burden of proving that the real property is subject to taxation'" (Matter of Lackawanna Cmty. Dev. Corp. v

Krakowski, 12 NY3d 578, 581 [2009], quoting Matter of New York

Botanical Garden v Assessors of Town of Washington, 55 NY2d 328,

334 [1982] [emphasis added]).

### Showing Necessary to Justify Revocation

In 1971, the Legislature amended former section 420 (1)

of the Real Property Tax Law, which mandated tax exemptions for

real property owned by a host of nonprofit organizations, to

carve out and place in paragraph (a) (present-day section 420-a

[1] [a]) those nonprofits whose real property remained

mandatorily exempt; and to create a new paragraph (b) (present-

day section 420-b [1] [a]) to specify other categories of

nonprofits whose real property municipalities were newly

empowered to tax pursuant to duly enacted local legislation (see

L 1971, ch 414).  Although the categories specified in former

section 420 (1) (b) are not exactly the same as those in its

present-day counterpart, the statute's general scheme to qualify

for a permissive exemption remains both the same as when first

enacted in 1971, and effectively identical to that established by

Real Property Tax Law § 420-a (1) (a) to qualify for a mandatory

exemption: first, the property must have been owned by a

nonprofit corporation or association organized or conducted

exclusively for one or more specified purposes (e.g., bible,

tract, benevolent, missionary, infirmary, public playground,

scientific, literary, bar association, medical society, library,

etc.); second, the property must have been used exclusively for

carrying out one or more of the enumerated purposes.

Many localities adopted local legislation permitting them to terminate the previously mandatory tax exemptions enjoyed by certain nonprofit organizations in their communities. The litigation that ensued generally called upon the courts to decide whether such a locality had, in fact, properly reclassified a particular nonprofit as qualified only for a permissive exemption. One of our first major cases addressing this aspect of the 1971 legislation involved an arboretum owned by the New York Botanical Garden (the Botanical Garden) and located in the Town of Washington (the Town) in Westchester County.

After the Botanical Garden acquired the arboretum in 1973, the Town treated the property as exempt from real property taxation. In 1977, however, the Town adopted a local law to exercise its power under the Real Property Tax Law to tax property owned by a nonprofit organization and used for scientific purposes. Acting under this local legislation, the Town restored the arboretum property to the tax rolls on the ground that the Botanical Garden's primary purpose and the arboretum's primary use were scientific and research-oriented. The Botanical Garden commenced an article 78 proceeding to have the arboretum property declared tax exempt.

In order to resolve the case on the merits, we were first required to determine whether the Botanical Garden or the Town had the burden of proof, and what that burden entailed. We

initially observed that while the taxpayer seeking a real

property exemption ordinarily bears the burden of proof,

> "under the circumstances presented here, in which the
> municipality, pursuant to its power under [the Real
> Property Tax Law], is seeking to withdraw a previously
> granted tax exemption, the municipality bears the
> burden of proving that the real property is subject to
> taxation.  Thus, the taxing authority must prove that
> the corporation or association is organized for a
> purpose only qualifiedly exempt (in this case, a
> scientific purpose) and that the property is used for
> such a purpose" (New York Botanical Garden, 55 NY2d at
> 334-335 [emphases added]).

Proceeding to the merits, we examined the Botanical

Garden's charter, and held that "[g]iven the wide range of

purposes for which [the Botanical Garden] is organized, we cannot

say that the town has sustained its burden of proving that a

scientific purpose predominates, notwithstanding [the Botanical

Garden's] own declarations of its scientific, among other,

purposes" (id. at 335).  In deciding whether the Botanical Garden

was a qualifiedly exempt scientific or a mandatorily exempt

charitable entity, we also considered it relevant that "the will

provision under which the arboretum was deeded to [the Botanical

Garden] permits such a grant only to a 'charitable organization'"

(id. at 335 n *).

Next, we determined that the Town had not shown that

the arboretum property was primarily used for a purpose that was

only qualifiedly exempt (i.e., a scientific purpose).  We

observed that "the use to which this particular parcel [was] put

accomplished several [absolutely] exempt purposes, including

educational, charitable and moral improvement purposes" (id. at 336).  Finally, we rejected the Town's argument that restrictions on public access to the arboretum's lands "deprive[d] them of a public purpose" (id. at 337).

Importantly, Town taxing authorities did not just wake up one day and decide to reevaluate Botanical Garden's tax-exempt status.  Rather, something objective -- a change of law (i.e., Chapter 414 of the Laws of 1971 and the local law adopted pursuant thereto) -- prompted the reevaluation.  Further, the nature of the change in law was such that we were required to decide whether the Town had properly determined that the nonprofit's purpose and use qualified only for a permissive exemption, or stated another way, no longer qualified for a mandatory exemption.

Although Botanical Garden arose in a particular context -- the 1971 amendments to the Real Property Tax Law -- we cited it in Lackawanna for the general proposition that a municipality (there, the City of Lackawanna) bore the burden of proof to justify revocation of a nonprofit's real property tax exemption. We did not articulate any particular test for the courts to apply when deciding that a revocation was not arbitrary; more to the point, we assuredly did not say that once a municipality makes colorable allegations that a nonprofit's use of real property fails to further an exempt purpose, then the burden shifts back to the nonprofit to establish its entitlement to an exemption

(cf. majority op at 10).  We simply stated conclusorily that

"[t]he Lackawanna tax assessor [had] satisfied his burden"

(Lackawanna, 12 NY3d at 581).  This was an easy conclusion to

reach on the record in Lackawanna, though, because the assessor

justified his decision on an independent and objective basis --

i.e., the New York State Office of Real Property Services (ORPS)

Exemption Administration Manual, which clearly indicated that the

property was taxable. Indeed, ORPS issued an advisory letter to

that effect to an attorney for the City of Lackawanna.  And

notably, there was a change in use after the exemption was

originally granted: the nonprofit acquired the properties between

1981 and 1985, and did not lease to a for-profit corporation

until 1993.

Here, the City has not satisfied its burden of proof.

First, it has not shown that Greater Jamaica fails to fulfill

section 420-a (1) (a)'s "purpose" or "organized or conducted"

criterion, unless the majority is willing to go so far as to

declare that economic and community development are not

"charitable, educational, or mental or moral improvement"

purposes within the meaning of Real Property Tax Law § 420-a (1)

(a).  We have never so held[4] and neither has the Appellate

-----

[4]Citing Lackawanna, the City claims that we have "held that
the economic revitalization of a distressed community does not
qualify as a charitable purpose under RPTL 420-a."  To the
contrary, in Lackawanna we pointedly "pause[d] to note [that] we
[were] not deciding whether [the property at issue] was exempt
from taxation prior to LCDC's leasing it to an entity that
carrie[d] out for-profit manufacturing activities on the

Division (see Plattsburgh Airbase Redevelopment Corp., 101 AD3d
at 24-25).  Indeed, the majority acknowledges that "there is
evidence in the record" that both Greater Jamaica and Jamaica
First were "organized or conducted exclusively for" a tax exempt
purpose (majority op at 11, 11 n 3; see also p 1, n 1, p 2, n 2,
supra).  As the majority also acknowledges, a nonprofit
organization's section 501 (c) (3) status bears on the overall
analysis of whether it is "organized or conducted exclusively
for" a tax-exempt purpose within the meaning of section 420-a (1)
(a).  Accordingly, I now turn to the City's newly-minted opinion
that the parking facilities are not used for Greater Jamaica's
exempt purposes.

### The City's Rationale for Revocation

It has long been the rule that "judicial review of an
administrative determination is limited to the grounds invoked by
the agency" (Rizzo v New York State Div. of Hous. & Community
Renewal, 6 NY3d 104, 110 [2005] [internal quotation marks
omitted]; see also Matter of New York State Ch., Inc., Associated
Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d 56,
75 [1996] [declining to adopt an agency's "[p]ost hoc
rationalization"]).  Thus, the majority improperly considers
proof offered by the City in response to the petition in this
case (see majority op at 10, discussing an affirmation of a City

property" (Lackawanna, 12 NY3d at 581).  Instead, "we assume[d]
without deciding that prior to . . . being leased, the [property
at issue] held by LCDC was exempt from taxation" (id.).

attorney).

Concomitantly out-of-bounds is the City's explanation, first advanced on appeal, that its decision to grant Greater Jamaica the tax exemption for tax years 2007-2008 through 2010-2011 was simply a "mistake," or "erroneously awarded in the first instance" (see id. at 9). In any event, the City's bare assertion of mistake is insufficient to satisfy its burden of proof. As the Appellate Division observed, a municipality may meet its burden to establish that a nonprofit's real property is subject to taxation "by proving, for example, a change in the law, a change in the use of the property, or that the tax exemption was erroneously awarded in the first instance" (111 AD3d 937, 939).

But there must be some objective indication that a revocation on the "erroneously awarded" basis was prompted by something other than a mere change of heart; that is, a prior decision does not become a "mistake" or "erroneous" any time a municipality decides to interpret existing authorities in a different way. Otherwise, the burden of proof has not, in reality, shifted from the nonprofit to the municipality when an exemption is withdrawn. The nonprofit still effectively bears the burden of showing entitlement and, importantly, enjoys no protection from being sandbagged by capricious and unpredictable administrative decisionmaking, which is what Greater Jamaica claims occurred here. Thus, the cases where the Appellate

Division referred to exemptions that had been "erroneously awarded" all dealt with an exemption granted despite a particular clear precedent to the contrary; namely, exemptions that contradicted "well-settled" law that "'real property . . . being used as a retirement community for middle-income elderly does not qualify for a tax exemption under [RPTL] 420-a'" (Matter of Quail Summit, Inc. v Town of Canandaigua, 55 AD3d 1295 [4th Dept 2008], quoting Matter of Greer Woodycrest Children's Servs. v Fountain, 74 NY2d 749, 751 [1989] and citing Matter of Presbyterian Residence Ctr. Corp. v Wagner, 66 AD2d 998, 999 [1978], affd for reasons stated 48 NY2d 885 [1979]; see also Matter of Pine Harbour, Inc. v Dowling, 89 AD3d 1192 [3d Dept 2011]).

Here, the letter from DOF's General Counsel indicates merely a change of heart about Greater Jamaica's entitlement to an exemption.  No new factual circumstances are adduced; the only post-2007 case that the General Counsel mentions is Lackawanna, which is cited along with Association of the Bar for the proposition, presumably well understood by the City in 2007, that an important public purpose does not alone qualify a nonprofit's real property for an exemption under Real Property Tax Law § 420-a (1) (a).  As "a preliminary matter," the General Counsel observed that Greater Jamaica's tax-exempt status under federal law was "not determinative of charitable use of the property as

defined by 420-a."[5]  Tellingly, though, she does not claim that

DOF originally <u>granted</u> the exemption to Greater Jamaica in

mistaken reliance on a presumption that Greater Jamaica was

qualified therefor solely because of its federal tax-exempt

status.  For this reason, the majority's lengthy discussion about

a presumption is beside the point in this case, which involves a

revocation.

Next, the General Counsel discounted <u>Matter of</u>

<u>Salvation Army v Town of Ellicott Bd. of Assessment Rev.</u> (100

AD2d 36 [4th Dept 1984]) and similar unnamed cases on the ground

that these authorities merely

> "demonstrate[d] that where a commercial enterprise
> (such as a thrift shop) is incidental to the main
> exempt purpose (providing rehabilitation and therapy
> for religious and charitable reasons) the commercial
> aspect does not destroy the entitlement to the
> exemption.  Here, the parking lots are not incidental
> to another recognized charitable purpose but are the
> very purpose for which the property is being used."

This last statement dodges the issue.  There is no

question that the parking lots are being "used" as parking lots -

- i.e., areas where visitors to Jamaica's urban core may leave

their vehicles temporarily for a fee; the question is whether

this use is incidental to Greater Jamaica's broad charitable

purpose to foster economic and community development, just as the

thrift shop's operation was incidental to the Salvation Army's

_____

[5]This comment, as is the case with much of what the letter
says, seems to respond to a submission made by Greater Jamaica,
which is not included in the record.

broadly stated exempt purposes.  Additionally, DOF could have and should have been well-aware of the decision in <u>Salvation Army</u> in 2007.  At that time, the agency would have been obligated to grant the exemption based on a determination that existing precedent supported the proposition that the parking facilities did, in fact, represent a use incidental to Greater Jamaica's charitable purposes.

The General Counsel also discussed whether the fact that the properties were owned by Jamaica First, a single-member limited liability company, rather than by its sole member, Greater Jamaica, disqualified Greater Jamaica from the exemption. In this regard, she stated that "it appears that [Jamaica First] collects amounts from the lots that exceed the carrying, maintenance and depreciation charges attributable to the premises" (<u>see</u> majority op at 9-10, citing this as a reason substantiating the City's revocation of Greater Jamaica's tax exemption).  The General Counsel's comment apparently refers to one of the requirements for determining whether to disregard Jamaica First as a separate entity; namely, the requirement that "[<u>r]ent</u> may not exceed carrying, maintenance and depreciation charges as specified in section 420-a" (DOF Letter Ruling No. 074873-021, <u>supra</u>, n 2 [emphasis added]; see also Real Property Tax Law § 420-a [2] [a nonprofit organization leasing real property to a corporation or association organized or conducted exclusively for one of the exempt purposes enumerated in section

420-a will receive an exemption for that property if it is used primarily for an exempt purpose and "any moneys paid for such use do not exceed the amount of the carrying, maintenance and depreciation charges of the property"]; Sisters of St. Joseph v City of New York, 49 NY2d 429 [1980]).  But in this case, Greater Jamaica did not lease the parking facilities to or collect rent from Jamaica First (see Matter of Scenic Hudson Land Trust v Sarvis, 234 AD2d 301 [2d Dept 1996] and cases discussed therein).

Finally, the majority states that the "economic benefit conveyed by below-market rate parking [] inures to the benefit of private enterprise," and concludes, on that basis, that this use "cannot be said to further any charitable purpose."  To the extent that the majority argues that Greater Jamaica is not entitled to an exemption because it receives revenue, this misapprehends the nature of Greater Jamaica's activities and our precedent.  In a broad sense, the parking facilities benefit, and are used by, Greater Jamaica in two distinct ways.  First, the parking facilities generate revenue, which is funneled back into Greater Jamaica's numerous development initiatives.  But crucially, the parking facilities directly further Greater Jamaica's charitable purpose of economic rejuvenation by allowing shoppers and other visitors a safe place to park while they patronize local businesses and educational, arts and religious institutions.  This is not a situation where Greater Jamaica's "avowed [charitable] purpose [is] a guise or pretense" for

profit-making (Real Property Tax Law § 420-a [2]).

In Lackawanna, by contrast, we held that the LCDC was not entitled to a real property tax exemption for land that was leased to a for-profit manufacturing firm (Lackawanna, 12 NY3d at 580).  In so holding, we explicitly noted that our decision was based solely on the fact that the only use of the property was as a revenue-producing rental.  Greater Jamaica, however, does not simply use the parking facilities as revenue-generating properties meant to raise funds for its economic development mission; it does not lease the facilities to a for-profit enterprise.  As a result, Greater Jamaica is more akin to the petitioners in Erie Station.

In that case, one petitioner, Adult Home at Erie Station, Inc. ("AHESI"), operated an adult home that provided its elderly residents with housing and what AHESI described as "a program of personal care" (Erie Station, 10 NY3d at 214).  We held that although "renting homes to elderly people who are not poor is not a 'charitable activity,'" citing Greer Woodycrest and Presbyterian, AHESI's property was "plainly [used for] a charitable purpose" because the property was provided at below-market rates (id).

The second petitioner in Erie Station, Regional Economic Community Action Program, Inc. ("RECAP"), was in a different position than AHESI because RECAP received the market rate for its properties (id. at 215).  Nonetheless, we held that

RECAP's property was also exempt from property taxation because "RECAP is engaged in social work, helping homeless people, alcoholics, drug addicts and other afflicted members of society to become productive and useful citizens," which we characterized as "undoubtedly a charitable activity" (id.).  We elaborated as follows:

> "That [the beneficiaries of RECAP's housing] pay market rents, and that RECAP may even benefit economically from its rental income, does not change the result. The issue is not whether RECAP benefits, but whether the property is "used exclusively" for RECAP's charitable purposes.  RECAP could lose its exemption . . . if the economic benefit went to its officers or employees personally, but an economic benefit to a charitable organization does not by itself extinguish a tax exemption.  The question is how the property is used, not whether it is profitable" (id. at 216 [emphasis added]; see also Congregation Rabbinical College of Tartikov v Town of Ramapo, 17 NY3d 763, 765 [2011] ["an economic profit made by a religious corporation 'does not by itself extinguish a tax exemption,'" quoting Erie Station, 19 NY3d at 216]).

To sum up, cases decided both before and after 2007 support DOF's 2007 decision to grant a tax exemption to Greater Jamaica for the parking facilities.  DOF points to no change in law or the use of the property or any other objective consideration to justify its 2011 flip-flop.  Before today, we had never ruled that a local government might simply change its opinion and revoke an exemption without some objective predicate for its revised determination.  Whether or not the 2011 revocation was improperly motivated, as Greater Jamaica and various amici contend, is impossible to say.  On this record, all we know is that DOF interpreted the facts and the law one way in

2007, and the opposite way in 2011, although neither the facts nor the law had changed in the interim.  Such an unexplained reversal of position is the very epitome of arbitrary administrative decisionmaking.  Accordingly, I respectfully dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order reversed, with costs, and matter remitted to the Appellate
Division, Second Department, for consideration of the issues
raised but not determined on the appeal to that court.  Opinion
by Judge Pigott.  Chief Judge Lippman and Judges Rivera, Abdus-
Salaam and Fahey concur.  Judge Read dissents in an opinion in
which Judge Stein concurs.

Decided July 1, 2015